## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

**GLENDA F. COTTRELL,**

     **Plaintiff,**

**v.**                                              **Civil Action No. 2:13-cv-11827**

**CAROLYN W. COLVIN**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court is Plaintiff's Brief in Support of Claim (ECF. No. 10), Brief in Support of Defendant's Decision (ECF No. 11) and Plaintiff's Brief in Reply to Brief in Support of Defendant's Decision.

### BACKGROUND

Glenda F. Cottrell, Claimant, filed an application for Supplemental Security Income Benefits and Widows Insurance Benefits on September 13, 2010 (Tr. at 162, 167). The claims were denied initially and upon reconsideration on December 10, 2010 (Tr. at 77, 80). Claimant requested a hearing before an Administrative Law Judge (hereinafter "ALJ) on January 7, 2011 (Tr. at 83, 86). An administrative hearing was conducted on February 23, 2012 (Tr. at 24-51). In the decision dated March 1, 2012, the ALJ determined that the Claimant was not entitled to supplemental security income and disabled widow' benefits (Tr. at 10 -23). On May 1, 2012, Claimant requested a review by the Appeals Council (Tr. at 6). On April 17, 2013, the Appeals Council "found no reason under our rules to review the Administrative Law Judge's decision and denied the request for review" (Tr. at 1).

On May 20, 2013, Claimant brought the present action requesting that the ALJ's decision should be vacated and remanded for proper vocational evidence to determine whether there is work in significant numbers in the national economy for the Claimant.

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's applications for widow's disability insurance benefits (DIB) and supplemental security income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).  Presently pending before the Court are Plaintiff's Brief in Support of Claim (ECF No. 10), Defendant's Brief in Support of Defendant's Decision (ECF No. 11) and Plaintiff's Brief in Reply to Brief in Support of Defendant's Decision (ECF No. 12).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520, 416.920 (2012).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  *Id*. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  *Id*. §§ 404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  *Id*.  §§ 404.1520(c), 416.920(c).  If a severe

2

impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.   *Id*. § 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  *Id*.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  *Id*. § 404.1520(e), 416.920(e).  By satisfying inquiry four, the claimant establishes a *prima facie* case of disability.  *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2012).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job and (2) that this specific job exists in the national economy.  *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant is the unmarried widow of the deceased insured worker and has attained the age of 50.  Therefore, the ALJ determined that Claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act (Tr. at 12).  The prescribed period ends on March 31, 2016.  The ALJ determined that Claimant has not engaged in substantial gainful activity since the alleged onset date of May 1, 2010.  The ALJ found that Claimant suffers from the severe impairments of obesity; chronic obstructive pulmonary disease; degenerative joint disease of the left knee with patellofemoral syndrome/tenosynovitis; bipolar disorder type I; anxiety disorder/panic disorder with agoraphobia; major depressive disorder; and posttraumatic stress

3

disorder (Tr. at 13).  The ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1 (Tr. at 14).  The ALJ then found that Claimant has a residual functional capacity (RFC) to perform light exertional work, reduced by nonexertional limitations[1] (Tr. at 15, 16).  Transferability of job skills is not an issue because Claimant does not have past relevant work experience (Tr. at 22).  The ALJ concluded that considering Claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Claimant can perform.  The ALJ determined that Claimant retained the residual functional capacity to perform a wide range of light work including a significant number of unskilled jobs that existed in the national economy (Tr. at 23). On this basis, benefits were denied.

**Scope of Review**

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In *Blalock v. Richardson*, substantial evidence was defined as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

---

[1] Claimant is able to lift up to twenty pounds occasionally, and lift and carry up to ten pounds frequently in light work as defined by the regulations.  She may occasionally climb ramps and stairs, bend, balance, stoop, kneel, crouch and crawl, but may never climb ladders, ropes or scaffolds.  She must avoid concentrated exposure to extreme cold, heat, vibration, humidity, wetness and irritants such as fumes, odors, dust, gases, chemicals and poorly ventilated spaces.  She must avoid all exposure to hazards such as moving machinery and unsecured heights. Additionally, Claimant is fully capable of learning, remembering and performing simple, routine and repetitive work tasks, involving simple work instructions, which are performed in a low stress work environment, defined as one in which there is no production pace, no strict quota requirements, no strict time standards and no "over-the-shoulder" supervision.  She may have occasional contact with supervisors and coworkers, but should have minimal to no contact with the general public (Tr. at 15, 16).

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational. *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

**Claimant's Background**

Glenda F. Blankenship married James W. Cottrell on November 13, 1981.  Mr. Cottrell died on March 8, 2009.  Glenda (Blankenship) Cottrell was born on October 14, 1960.  She was 48 years old when Mr. Cottrell died.  When the ALJ issued his decision on March 1, 2012, Claimant was 51 years of age.  Claimant has an 11th grade education. The ALJ found that Claimant has no relevant past work.

**The Medical Record**

Westbrook Health Services completed an Initial Comprehensive Psychiatric Evaluation of Claimant on April 24, 2006 (Tr. at 452).  She was admitted to the crisis stabilization unit by Teresita DeJosef, M.D., with a diagnosis of major depressive disorder, severe, recurrent, without psychotic features; post traumatic stress disorder; and global functioning score of 28.  (*Id.*)  Upon Mental Status Examination, Claimant denied any swelling in her extremities (Tr. at 451).  Her gait was normal.

On February 28, 2008, Claimant went to the emergency department at Roane General Hospital in Spencer, West Virginia, due to experiencing anxiety (Tr. at 281-283).   Shortly

thereafter, on March 4, 2008, Claimant reported to Melanie Akalal, M.D., at Roane County Family Healthcare, that she believed her husband was going to kill her (Tr. at 353).

Claimant received psychological treatment from Heather Paxton, a counselor at Roane County Family Healthcare.   Ms. Paxton stressed the importance of Claimant taking her prescribed medications regularly (Tr. at 358).   Claimant continued to receive counseling from Ms. Paxton through December 2011.   On January 3, 2012, Ms. Paxton and Timothy S. Sarr, Ph.D., Licensed Psychologist, completed a treatment summary for Claimant (Tr. at 502-503). The treatment summary stated that Claimant's psychotic symptoms are well managed with medication (Tr. at 502).   The treatment summary reported that Claimant lives independently and attends to her own daily living needs.   The treatment summary stated that "based on the time this provider has spent with the client over the past three years, it is not likely that she will be able to maintain employment or even a routine schedule at this time."   (*Id.*)   Claimant was reported to be easily distracted by others and often socially withdrawn.   The treatment summary stated that she experiences bouts of depression and decompensation that involve feelings of hopelessness, helplessness and intense sadness.   Claimant was reported as experiencing significant difficulty with trust and vulnerability.

On August 14, 2008, Claimant reported experiencing pain in her left knee.   Amber Knowlton, PA, at Roane County Family Healthcare, diagnosed patellar tendinitis (Tr. at 374). Claimant had a follow-up evaluation of her left leg pain by Brian Baker, PA, on August 28, 2008 (Tr. at 375-376).   Claimant was reported to appear pleasant and in no apparent distress (Tr. at 375).   Mr. Baker's plan of treatment was for Claimant to wear a knee brace, perform hamstring exercises and take her prescription of Flexeril for muscle spasms (Tr. at 376).

Claimant was treated by Carroll Christiansen, M.D., at Roane County Family Healthcare on December 11, 2008, for follow-up evaluation of left knee pain (Tr. at 379-380). Upon physical examination, Claimant appeared pleasant, in no apparent distress (Tr. at 379). Claimant's left knee demonstrated tenderness (Tr. at 380). Dr. Christiansen diagnosed Claimant with patellar tendinitis. Dr. Christensen administered Claimant an injection of Depo Medrol and Lidocaine 1% in her left knee. Claimant was instructed to perform strengthening exercises.

Claimant saw Ms. Paxton on January 29, 2009, for a routine psychotherapy session (Tr. at 383-384). Upon mental status observation, Claimant was reported to be friendly, cooperative, fairly well kempt, less depressed, coherent and alert. Claimant saw Ms. Paxton again on February 2, 2009, for a routine psychotherapy session (Tr. at 385-386). Upon mental status observation, Claimant was reported to appear disheveled and behave friendly and cooperatively (Tr. at 385). Claimant's judgment, insight and concentration were reported as fair.

On March 23, 2009, Claimant saw Dr. Christiansen for a follow-up evaluation due to hypertension and osteoarthritis (Tr. at 387-388). Upon physical exam, Claimant's height was 5 ft 4 inches and weight was 215 pounds. Claimant was reported to be obese. Claimant's gait and station were within normal limits. Inspection and palpation of her bones, joints and muscles were unremarkable. Claimant was reported as not being in acute distress. Claimant was pleasant and cooperative. Her mood and affect were depressed and sad. Claimant's treatment plan involved weight loss and nutrition counseling.

On April 8, 2009, Claimant completed a Social Security Administration Function Report (Tr. at 207-218). Claimant reported to living with her sister. Claimant stated that her daily activities include doing housework (Tr. at 207). Claimant stated that if her knees start to hurt, she takes her medication to ease the pain. Claimant reported that she couldn't watch her

grandchildren because her knees prevented her from chasing after them.  She reported that her knees hurt when she tries to do yard work.  Claimant reported to taking care of her sister by assisting her with everyday tasks and taking care of her bills for her (Tr. at 208).  Claimant has a dog that she feeds and baths.  Claimant reported that no one helps her take care of her dog.  She reported to experiencing sleep interruptions due to leg pain and nightmares.

As for personal care, Claimant reported that she can bathe and dress herself.  Sometimes she needs reminded to eat and to take her medicine (Tr. at 208-209).  Claimant stated that she prepares her own meals daily and "can cook just about anything" (Tr. at 209).   She reported that it takes her approximately an hour to prepare her meals.  As for house and yard work, Claimant reported to washing and drying her clothes.  She stated that she washes dishes.  If her knee hurts, she props it up on a chair.  She reported that her knees hurt if she tries to perform yard work.

Claimant reported that she has "a hard time walking very far"[2] (Tr. at 210).  Claimant drives herself except when her knee hurts.  Claimant shops for groceries and clothes in stores and on the computer.  Claimant reported to shopping "about 30 minutes to an hour because [her] legs start hurting." She prefers for someone to go to the store with her. Claimant is able to pay bills, count change, handle a savings account and use a checkbook/money order.

Claimant reported that her hobbies and interests include reading, doing puzzles and taking care of her house plants (Tr. at 211).  She is able to do these hobbies on her own.  Claimant reported to spending time with others daily although she prefers to be alone.  Claimant stated that she tries to go to town once a week although being around a lot of people causes her to have anxiety and panic attacks. Claimant reported to experiencing difficulty trusting people

---

[2] Although Claimant testified that she could not walk far, the history provided in doctors' office visits stated that she smoked (1) pack of cigarettes per day and "exercised regularly."

(Tr. at 212).    Claimant reported that her "knees seem to hurt no matter what [she does]." Claimant reported that she can walk 30-40 feet before needing to stop and rest for 15 minutes. Claimant reported to using a knee brace when she walks a lot (Tr. at 213). Claimant asserts the knee brace was prescribed in October 2008. Claimant reported to having "racing thoughts" that make her think someone wants to harm her (Tr. at 214).   She stated that she tries to remember to take her medication.

Additionally, on April 8, 2009, Claimant completed a Personal Pain Questionnaire (Tr. at 215-218).   Claimant reported to experiencing pain in both her knees but mostly in her left knee (Tr. at 215).  Claimant reported to experiencing the pain continuously.   She stated that the pain lasts "all day without stopping."  (*Id.*)  She reported that walking, standing bending and stooping causes the pain to increase.  Claimant reported that her medicine helps ease the pain.  Claimant reported to also experiencing pain in her left side several times per day (Tr. at 216).   The pain lasts approximately 30 minutes, then eases up and starts again.  Claimant reported that she hadn't been treated for the pain in her side because she didn't have health insurance.  She stated that her side pain increases when she tries to lift anything (Tr. at 217).

Ms. Paxton saw Claimant on April 9, 2009, for routine psychotherapy (Tr. at 389-390). Claimant reported that "her husband's life insurance will be enough to sustain her until she can start receiving widow benefits in 2 years" (Tr. at 389).   Upon mental status observation, Claimant was reported to appear disheveled.  Her behavior was friendly and cooperative.  Her mood appeared depressed.  Her thought process was coherent.  Her judgment and insight were fair.

Thomas Lauderman, DO, performed a physical residual functional capacity assessment of Claimant on April 24, 2009 (Tr. at 287-294).   Dr. Lauderman found Claimant to have the

following exertional limitations:  occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; and push and/or pull an unlimited amount, other than as shown for lift and/or carry (Tr. at 288).  Dr. Lauderman's comments stated that Claimant's knee range of motion was full (Tr. at 294).  Dr. Lauderman found that Claimant did not experience edema or crepitus.  He found Claimant's left knee to demonstrate lateral aspect tenderness and mild effusions.  He found there was no movement disorder.  Claimant received an injection of Depo Medrol and was prescribed diazepam and Darvocet.  Dr. Lauderman commented that Claimant's activities of daily living showed no restrictions in personal care due to physical limitations.  Claimant cooks, does laundry, washes dishes, drives and shops.  Claimant stated that she could walk 30-40 feet.  Dr. Lauderman found Claimant to be credible although he found she did not meet or equal a Listing.  (*Id.*)

Claimant saw Ms. Paxton April 30, 2009 (Tr. at 391-392).  Claimant reported to missing her husband terribly.  Upon mental status observation, Claimant was friendly and cooperative.  Her mood was depressed (Tr. at 391).  Her thought process was coherent.  Her immediate, recent and remote memories were intact.  Her judgment was fair and her insight was good (Tr. at 392).  Ms. Paxton saw Claimant on June 8, 2009, for routine psychotherapy (Tr. at 393-394).  Claimant reported to "doing much better" (Tr. at 393).  Upon mental status observation, Claimant was friendly and cooperative (Tr. at 393).  Her mood appeared less depressed.  Her thought process was coherent.  Her judgment and insight were fair.  Her immediate, recent and remote memories were intact.  Ms. Paxton saw Claimant again on August 3, 2009 (Tr. at 395-396).  Upon mental status observation, Claimant was friendly and cooperative (Tr. at 395).  Her mood appeared less depressed.  Her thought process was coherent.  Her attention span and concentration were good.

Her judgment and insight were fair (Tr. at 395-396).  Claimant was reported to have "progressed well" and have "responded well to her medications" (Tr. at 396).

On July 29, 2009, S. Park, at the Center for Disability, completed a case analysis regarding Claimant's alleged disability (Tr. at 295).  The case analysis indicated there has been evidence of tenderness in Claimant's knees.  Claimant's left knee had full range of motion and both knees were stable.  There were no x-rays of Claimant's hands or knees.  The analysis found there was no gait evaluation or evaluation of Claimant's ability to stand and walk with heels and toes.  The case analysis indicated there is no confirmed diagnosis of patella-fermoral syndrome, instability of the knee and osteoarthritis of the hands.  (*Id.*)  The case analysis concluded that Claimant's pain and allegations are not fully supported by medical evidence.  The analysis stated that the medical evidence was insufficient and x-rays of the joints of the knees and hands needed to be taken.

On July 30, 2009, C. Jusino Berrios, M.D., performed a psychiatric review of Claimant (Tr. at 296-309).  The psychiatric review found there was insufficient evidence to determine an impairment (Tr. at 296).  His consultant notes stated that Claimant alleges bipolar disorder, depression and paranoia (Tr. at 308).  Dr. Berrios reported that there is no evidence of psychiatric treatment.  He reported that Claimant missed the consultative exam. (*Id.*)  Dr. Berrios stated that in order to establish the presence and severity of the mental conditions, the development of medical evidence is needed.  (*Id.*)

Claimant's chief complaints at a follow-up visit at Roane County Family Healthcare on August 12, 2009, were anxiety and left knee pain (Tr. at 397-398).  Claimant reported to "losing balance when walking for about 2-3 months" (Tr. at 397).  Claimant reported that "when walking and carrying weights [her] left knee will feel weak and feels like it will give out."  Claimant

admitted to smoking (1) pack of cigarettes per day. Claimant reported to exercising regularly. Upon physical examination, Claimant's height was 5 ft 4 inches tall and weight was 215 pounds. Claimant was pleasant and cooperative. Her mood and affect were normal. Claimant's knee demonstrated left patella crepitus with extension/flexion (Tr. at 398). Her knee demonstrated no evidence of subluxation, dislocation or laxity. She had full range of motion and strength was reported to be 5/5. Claimant's counseling plan involved reducing stress. Claimant was counseled on exercise and weight loss.

Dr. Christiansen saw Claimant on August 28, 2009, for a follow-up evaluation of anxiety and panic disorders (Tr. at 399-400). Claimant reported to smoking (1) pack of cigarettes per day and exercising regularly (Tr. at 399). Claimant's weight had decreased to 209 pounds. She appeared to not be in any acute distress. She was pleasant and cooperative. Her mood was anxious. Claimant's left knee pain was not discussed under physical examination or treatment plan.

On October 5, 2009, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 401-402). Upon mental status observation, Claimant was friendly and cooperative. Her mood was depressed. Her thought process was coherent. Her immediate, recent and remote memories were intact. Her insight and judgment were fair (Tr. at 401). On November 3, 2009, Claimant had a follow-up visit with Dr. Christiansen (Tr. at 403-404). Claimant admitted to smoking (1) pack of cigarettes a day and exercising regularly (Tr. at 403). Claimant's judgment and insight were good. She was diagnosed as overweight with osteoarthritis (Tr. at 404).

On February 2, 2010, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 405-406). Claimant reported that "she has been doing pretty well" (Tr. at 405). She reported that she is enjoying her new home and is able to have her grandchildren over often. She stated that "she

has a hard time getting motivated to do anything, stating that although she has plans to do things, she often just sticks to her chores and must-dos." (*Id.*)  Upon mental status observation, Claimant was friendly and cooperative. Her judgment and attention span were good.  Her insight was fair. Claimant was diagnosed with bereavement (Tr. at 406).

On May 26, 2010, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 407-408). Upon mental status observation, Claimant was friendly and cooperative.  Her mood was anxious and depressed.  Her thought process was coherent.  Her immediate, recent and remote memories were intact.  Her attention span, concentration and judgment were good. Her insight was fair (Tr. at 408).    Ms. Paxton stressed the importance of staying socially active because remaining socially isolated will cause her anxiety and depression to increase. (*Id.*) Ms. Paxton noted that Claimant "appears to be functioning well, as her home is well taken care of, her bills are paid, and she has a substantial amount of life insurance money left until she starts getting her widow benefits in October."  Further, it was noted that Claimant "seems to harbor guilty feelings for enjoying life without her husband."

On June 24, 2010, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 412-413). Claimant reported that "she has been doing fairly well" (Tr. at 412).   Claimant reported to experiencing "some difficulties when she went on a road trip with her friend to Kentucky." Claimant reported to experiencing panic attacks during the trip.   Once she arrived at her destination in Kentucky "she had a good time and enjoyed herself and did not have any anxiety on the way home."  Claimant reported to having a boyfriend.  Claimant reported that "she has been getting out more and being more social."  Claimant reported that it was getting easier for her.  She reported that her driving has improved and that she goes places more often as a result. Claimant was assessed with agoraphobia with panic disorder (Tr. at 413).

13

On August 24, 2010, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 414-415).  Claimant reported that "she continues to do pretty well" (Tr. at 414).  Claimant reported that she had been experiencing more anxiety.  She reported that "her insurance money is nearly gone but [she stated that] she has plenty to get her through until her widow benefits should start in October."  (*Id.*)  She reported to experiencing guilt from seeing her boyfriend even though her husband is deceased.  Claimant reported that she goes to the store on a regular basis but that she is more comfortable going with her sister.  Claimant stated that she planned to make a quilt out of her husband's clothes, but could not stand the thought of cutting up his clothes.  Ms. Paxton discussed discharging Claimant, but Claimant stated that she would like to continue seeing Ms. Paxton every 2 months (Tr. at 415).  Ms. Paxton discussed the possibility of Claimant getting a "small household dog or cat to keep her company and help her with feelings of loneliness when her sister is gone."

On September 21, 2010, Claimant completed a Social Security Administration Function Report (Tr. at 233-240).  Claimant reported to living alone (Tr. at 233).  Claimant stated that she gets depressed and has mood swings.  She stated that she gets confused and begins to think someone is going to hurt her.  Claimant reported her daily activities to include cleaning the house, washing and drying clothes, folding clothes, washing dishes, taking medication and sometimes watching television (Tr. at 234).  Claimant reported that she does not take care of anyone else. (*Id.*)  Claimant reported that she does not take care of any pets or animals.  (*Id.*)  Claimant reported difficulty sleeping at night and inability to perform yard work or socialize.  Claimant reported to forgetting to eat and take her medications (Tr. at 234-235).  Claimant reported to preparing her own meals twice a week.  She stated that it takes her approximately 1-2 hours to prepare a meal.

14

Claimant reported to dusting, washing and drying clothes, washing dishes and sweeping the floor (Tr. at 235).  Claimant stated that it takes "about 1-2 hours for each chore."  Claimant reported that she cannot perform yard work due to running out of breath (Tr. at 236).  Claimant reported that she shops for groceries once a month.  She reported that it takes her approximately 2-3 hours to shop.  Claimant reported that she is able to pay bills, count change, handle a savings account and use a checkbook/money orders.  Claimant's hobbies and interests included reading, gardening and working puzzles (Tr. at 237).  She stated that she occasionally performs her hobbies.  Claimant reported that her medical conditions cause her to take breaks while gardening.  She stated that she experiences difficulty concentrating and finishing puzzles and books.

Claimant reported to participate in social activities such as attending family gatherings, going to the store and going to town, approximately twice a month. (*Id.*)  Claimant reported that she needed to be reminded to go places and preferred someone accompany her.  When checking all the abilities she experiences difficulty in performing due to her medical condition, Claimant did not select the ability to sit (Tr. at 238).  When describing the affects her medical condition has on her abilities, she stated that her knees hurt when she stands, kneels, bends and squats and that she runs out of breath when walking.  (*Id.*)  Claimant reported that she can walk 100-200 feet before needing to stop and rest for 20-30 minutes.  Claimant reported to getting upset due to changes in routine (Tr. at 239).  Claimant reported to wearing a brace on her left knee which she asserts was prescribed in 2009.

On October 4, 2010, Rakesh Wahi, M.D., performed a consultative examination for the West Virginia Disability Determination Service (Tr. at 311-314).   The examination lists Claimant's impairments to include bipolar disorder, depression, anxiety, panic attacks, incontinence, left knee problems, COPD and insomnia (Tr. at 311).  Claimant stated that she was

diagnosed as suffering from bipolar disorder in 2000, when she developed symptoms of confusion.  Claimant stated that "as long as she takes medications, she does reasonably well.  However, if she stops the medications, she gets frequent episodes of paranoid delusions, and visual and auditory hallucinations."  Dr. Wahi reported that Claimant had been hospitalized twice for inpatient psychiatric facilities ranging from 7-9 days.  Dr. Wahi also pointed out that Claimant had been suffering from pain in her left knee and had received multiple intra-articular injections of steroids.  The consultative examination reported that Claimant is unable to walk very far because of the pain in her knee.  Claimant stated that she suffers from significant urinary incontinence (Tr. at 312).  The consultative examination reported that Claimant "smokes a little."  The report stated that she smokes "about half-a-pack a day."  Claimant reported that she did not have any hobbies except for trying to solve puzzles in the wintertime.  (*Id.*)

Upon review, Dr. Wahi reported Claimant's general health to be fair.  Upon physical examination, Claimant was reported to be obese in appearance, well dressed and well groomed with good personal hygiene (Tr. at 313).  Claimant's affect was "markedly depressed."  She was fully oriented and cooperative.  At the time of the consultative examination, Claimant weighed 205 pounds.  Upon examination of extremities, Claimant demonstrated a normal gait.  (*Id.*)  She was able to get on and off the examining table without any difficulty.  Claimant was unable to squat and walk on her heels to toes.  Claimant had normal range of motion in her shoulders, elbows, wrists, hips and ankles bilaterally (Tr. at 314).  Examination of the right knee showed flexion and extension of 140 degrees and extension and flexion of 90 degrees with the presence of considerable crepitus of the left knee.  Dr. Wahi's opinion stated "The claimant suffers from severe depression, which is accompanied by paranoid delusions including auditory hallucinations.  Despite taking medications, the claimant's control only appears to be fair.  In

16

addition, she suffers from severe shortness of breath, which prevents her from engaging in any strenuous physical activities." (*Id.*)

On October 7, 2010, Laurel Klein performed a physical RFC of Claimant (Tr. at 321-328). Claimant's exertional limitations included occasionally lifting and/or carrying 20 pounds; frequently lifting and/or carrying 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; and push and/or pull an unlimited amount, other than as shown for lift and/or carry (Tr. at 322). Ms. Klein agreed with Dr. Wahi's opinion that Claimant's "shortness of breath prevents her from engaging in strenuous activity" (Tr. at 327). Ms. Klein's comments point out that an x-ray of the left knee showed no bone abnormality (Tr. at 328). Claimant was reported to not be fully credible. Ms. Klein stated that Claimant is able to perform most of her daily activities. (*Id.*) Ms. Klein stated that Claimant's RFC was for light work. (*Id.*)

On October 8, 2010, James W. Bartee, Ph.D., completed a psychiatric review (Tr. at 329). Dr. Bartee found Claimant's impairments, consisting of Listing 12.04 Affective Disorders and Listing 12.06 Anxiety-Related Disorders, not to be severe. Dr. Bartee reported that Claimant did evidence the presence of the impairment of bipolar disorder but that it did not precisely satisfy the diagnostic criteria for the disorder (Tr. at 332). Dr. Bartee also reported that Claimant did evidence the presence of the impairment of panic disorder with agoraphobia but that it did not precisely satisfy the diagnostic criteria for the disorder (Tr. at 334). Dr. Bartee rated Claimant's functional limitations in activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence or pace as mild (Tr. at 339). Claimant did not experience any episodes of decompensation. Dr. Bartee found that evidence did not establish the criteria necessary for Listings 12.04 and 12.06 (Tr. at 340). Dr.

Bartee's notes state that he gave Dr. Wahi's report "less weight as it is based on a single interaction and Claimant's reports—it is also inconsistent with reports from therapist who documents steady improvement and stable current condition" (Tr. at 341). Dr. Bartee's notes stated that "The deficits associated with the claimant's mental impairments do not impose any more than mild limitations in any of the functional domains. The claim is assessed as non-severe due to mental disorders." (*Id.*) Dr. Bartee noted that "Claimant appears capable of performing [significant gainful activity] on a sustained basis within any limits imposed by the [physical] RFC." He noted that the severity of Claimant's alleged psychological symptoms are disproportionate compared to the objective medical evidence of record.

On October 20, 2010, Claimant saw Dr. Christiansen to obtain a health maintenance exam for the Department of Health and Human Resources (hereinafter DHHR) (Tr. at 418-419). Claimant reported to experiencing panic spells. Claimant reported that her osteoarthritis was "fairly well controlled pain-wise" (Tr. at 418). Claimant was diagnosed with swelling, mass or lump in the head and neck; agoraphobia with panic disorder; overweight; tobacco use/abuse; and schizoaffective disorder (Tr. at 419).

On October 21, 2010, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 420-421). Claimant reported that "she continues to do very well" (Tr. at 420). Claimant reported that she still sees her boyfriend and that they get along very well. Claimant reported that "she was denied her SSI and widow benefits." Claimant reported that "she had an interview regarding her psychological difficulties as part of her application for SSI, in which the doctor asked her how being bipolar [a]ffects her life." Claimant reported that she could not put it into words. Claimant stated that "she realizes that if she misses even one dose of medication, she starts having paranoid thoughts and thinking things she knows she shouldn't." Ms. Paxton praised

Claimant for continued success and progress in therapy.  Ms. Paxton "provided [Claimant] with suggestions regarding her future appeal for SSI benefits" (Tr. at 421).  On November 3, 2010, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 422-423).  Claimant reported that "she continues to do fairly well" (Tr. at 422). Claimant reported that "she met with her attorney regarding her disability benefits appeal."  Claimant reported that "her lawyer told her that someone will likely have to be called as a witness in her hearing to testify about [her] behavior in the past when she was having paranoid episodes."  Claimant worries that if she were to stop taking her meds that she could experience paranoid episodes again.  Claimant reported "that when she is home alone, she often gets fearful when she hears noises outside and wonders if she is not getting paranoid again."  Ms. Paxton noted that she discuss with Claimant "the importance of recognizing the difference between paranoia and fear.  [They] discussed how some things make us scared but that we aren't losing our touch with reality" (Tr. at 423).  Ms. Paxton and Claimant "[d]iscussed how this is different from paranoia."  (*Id.*)

On December 10, 2010, Porfiro Pascasio, M.D., performed a physical residual functional capacity assessment of Claimant (Tr. at 426-433).  Claimant's exertional limitations included occasionally lifting and/or carrying 20 pounds; frequently lifting and/or carrying 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; and push and/or pull an unlimited amount, other than as shown for lift and/or carry (Tr. at 427).  Dr. Pascasio noted to finding Claimant partially credible.  Claimant's RFC was found to be light (Tr. at 431).  Dr. Pascasio's comments included that Claimant's osteoarthritis was "fairly well controlled pain-wise" (Tr. at 433).  Claimant was positive for arthritis condition and osteoarthritis.  Claimant was pleasant and cooperative upon examination.

Also, on December 10, 2010, Bob Marinelli, Ed.D. a Professor in the Department of Counseling Psychology at West Virginia University, conducted a psychiatric review of Claimant (Tr. at 435-447). Dr. Marinelli assessed Claimant from March 8, 2009, to December 10, 2010. He found her not to possess severe impairments (Tr. at 435). Dr. Marinelli diagnosed Claimant with the Listing 12.04 affective disorder of bipolar although the disorder did "not precisely satisfy the diagnostic criteria" (Tr. at 438). Dr. Marinelli diagnosed Claimant with the Listing 12.06 anxiety-related disorder of panic with agoraphobia although the disorder did "not precisely satisfy the diagnostic criteria" (Tr. at 440). Dr. Marinelli rated Claimant's functional limitations activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence or pace as mild (Tr. at 445). Claimant did not experience any episodes of decompensation. Dr. Marinelli found that evidence did not establish the criteria necessary for Listings 12.04 and 12.06 (Tr. at 446). Dr. Marinelli's consultant notes stated that Claimant "was assessed as non-severe" (Tr. at 447). Claimant appeared credible.

On January 1, 2011, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 464-465). Claimant reported to arguing with her pregnant, younger sister. She reported that she was still dating her boyfriend and "things are going well in that department" (Tr. at 464). Her judgment and insight were good. Her immediate, recent and remote memories were intact. Her mood appeared "less depressed." Her thought process was coherent. Her attention span and concentration were good.

On February 9, 2011, Amber Knowlton, PA, saw Claimant to evaluate a cough (Tr. at 466-468). Claimant was assessed with acute sinusitis (Tr. at 467). On February 16, 2011, Claimant had an office visit with Dr. Christiansen for treatment of bipolar disorder and as an initial evaluation of an injury she sustained from falling one week prior on ice and snow. (Tr. at

469-471).  Claimant also presented complaints of memory loss, stress, wheezing, incontinence and lack of sleep (Tr. at 469).  Claimant was diagnosed with influenza, panic disorder without agoraphobia, bipolar disorder, depression, agoraphobia with panic disorder and schizoaffective disorder (Tr. at 470).

On March 3, 2011, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 472-473).  Claimant reported to still arguing with her sister (Tr. at 472).  Claimant reported that her sister's doctors had asked her if she would be guardian for her sister and her sister's baby.  Claimant stated that she told the doctors that she would do so.  Ms. Paxton and Claimant discussed Claimant's decision to raise her sister's baby (Tr. at 473).  On April 12, 2011, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 474-475).   Claimant reported to spending much of her time helping her younger sister move back into Claimant's home and taking care of her sister's baby (Tr. at 474).  Ms. Paxton and Claimant discussed the importance of Claimant being sure of what she really wants before she signs papers taking on the responsibility of her younger sister's newborn baby (Tr. at 475).

On May 4, 2011, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 476-477).  Claimant reported "that she has been doing fairly well with some days of increased depression recently" (Tr. at 476).  Claimant reported to still seeing her boyfriend.  On May 24, 2011, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 478-479).  Claimant reported "that things have been going pretty well at home" (Tr. at 478).  She reported that she has been able to go to her boyfriend's house without being accompanied by her sister.  Ms. Paxton and Claimant agreed "to scheduling sessions a month apart at this time for maintenance" (Tr. at 479).

On July 5, 2011, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 480-481).  Claimant reported to getting to visit her sister's infant son once a month (Tr. at 480).    Claimant

reported "some financial difficulties recently, stating her son can no longer help her due to financial issues of his own" (Tr. at 480). Claimant stated that "she hopes her disability will be approved soon, as it's getting harder to make ends meet with only her sister's disability check." She reported to still seeing her boyfriend and that "they get along very well." Claimant reported that she is getting to spend more time with her boyfriend. She reported that her grandchildren are spending more time with her, which makes her very happy. Claimant reports "her medications continue to work well and denies any recent psychotic symptoms or tendencies." Ms. Paxton notes that Claimant "is well stabilized on her medication but continues to request monthly to bi-monthly therapy for support" (Tr. at 481).

On July 13, 2011, Claimant saw Dr. Christiansen for treatment of bipolar disorder and presenting evaluation of cold symptoms (Tr. at 482-484). Claimant admitted to smoking (1) pack of cigarettes per day and exercising regularly (Tr. at 482). On August 9, 2011, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 485-486). Claimant reported that "she has been more depressed recently, as she has not had her Abilify in a month" (Tr. at 485). Claimant stated that the medication was on backorder. She reported that "she has been able to take one of her pills for anxiety, which she states helps significantly with going to public places and feeling more motivated." She reported that she is willing to help her younger sister raise the sister's baby if the sister regains custody of the child. Ms. Paxton and Claimant discussed the importance of Claimant being aware of her symptoms and contacting her doctor or therapist if she were to develop psychoses (Tr. at 486).

Ms. Paxton completed a mental RFC of Claimant on August 26, 2011 (Tr. at 453-456). None of Claimant's functions were rated as severe. Her ability limitations were found as follows: ability to remember locations and work-like procedures was mildly limited; ability to

understand and remember very short and simple instructions was mildly limited; ability to understand and remember detailed instructions was moderately limited; ability to carry out very short and simple instructions was mildly limited; ability to carry out detailed instructions was moderately limited; ability to maintain attention and concentration for extended periods was moderately limited; ability to perform activities within a schedule, maintain regular attendance and punctual within customary tolerances was mildly limited; ability to sustain an ordinary routine without special supervision was mildly limited; ability to work in coordination with or proximity to others without being distracted by them was moderately limited; ability to make simple work-related decisions was moderately limited; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods was moderately limited; ability to interact appropriately with the general public was mildly limited; ability to ask simple questions or request assistance was mildly limited; ability to accept instructions and respond appropriately to criticism from supervisors was mildly limited; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes was mildly limited; ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness was not limited; ability to respond appropriately to changes in the work setting was mildly limited; ability to be aware of normal hazards and take appropriate precautions was not limited; ability to travel in unfamiliar places or use public transportation was mildly limited; and the ability to set realistic goals and make plans independently of others was mildly limited.  Ms. Paxton's mental RFC remarks stated that Claimant "is currently stable on medications and consistently scheduled therapy.  However, she becomes easily overwhelmed and labile with even the slightest of situational stressors.  She has significant difficulty

concentrating and remembering more abstract, comprehensive things.  She continues to struggle depressive symptoms while psychoses is well managed under medication" (Tr. at 456).

On August 27, 2011, Dr. Christiansen filled out a medical source statement concerning the nature and severity on Claimant's physical impairment form (Tr. at 457-462).  Dr. Christiansen selected the answer on the form under sedentary work that stated "Yes, my patient has been capable of performing sustained sedentary work on a regular and continuing basis, *i.e.*, 8 hours a day, 5 days a week or on an equivalent work schedule" (Tr. at 457).  She selected the answer on the form under light work that stated "No, my patient has not been capable of performing sustained light work on a regular and continuing basis, *i.e.*, 8 hours a day, 5 days a week or an equivalent work schedule" (Tr. at 458).  The form asks under light work, "If your patient has the freedom to alternate sitting and standing during the work day, would your opinion change?"  Dr. Christiansen marked the answer stating "No, even if my patient had the freedom to alternate sitting and standing during the work day, I believe my patient still would be limited as I have indicated above."  Dr. Christiansen stated the onset date was in 2009 and that although Claimant's "psychiatric limitations are most disabling," she has physical problems such as COPD (Tr. at 462).  Dr. Christiansen further comments that Claimant "has moderate COPD which limits her exertional capacity" (Tr. at 463).

On September 14, 2011, Claimant saw Dr. Christiansen for a follow-up evaluation of anxiety and panic attacks (Tr. at 487-489).  Claimant also sought an "initial evaluation of knee pain left" (Tr. at 487).  Claimant wanted a shot for her left knee. Claimant's left knee was injected with Depo Medrol and Lidocaine 1% (Tr. at 488). Claimant was instructed to return to the office in 4-5 months (Tr. at 489).

On September 20, 2011, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 490-491).   Claimant reported increased depression (Tr. at 490).   Claimant reported that she went an entire month without seeing her boyfriend "due to the cost of gas."   Claimant reported to staying a few days with her son after his wife had their baby.   Claimant was able to be in the room during the baby's delivery.   On September 30, 2011, Claimant saw Donna Shanholtzer, C-FNP, for an evaluation of abdominal pain (Tr. at 492-494).   Claimant was instructed to "push fluids" and eat small, frequent meals. Claimant was prescribed Ultram for pain.   She was instructed to return to the office if her conditions worsen or if there is no improvement in 2-3 days (Tr. at 494).

On October 18, 2011, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 495-496).   Claimant reported that her primary care physician "had to increase her anti-depressant recently due to increases in anxiety and panic attacks" (Tr. at 495).   She reported to feeling overwhelmed with concern about her sister's custody situation with her baby.   Claimant reported that people informed her sister "that they felt [Claimant] was taking advantage of her sister because she depends on her sister's social security check each month to pay the bills."   Claimant reported that this comment upset her "because they will not make it financially if they do not use her sister's income, but states she would never take from her sister or prevent her sister from having the things she wants when they can afford it."   Ms. Paxton and Claimant discussed Claimants increased depression and anxiety and how this likely relates to her concern and feelings of guilt regard her inability to take care of her sister's baby (Tr. at 496).   On November 1, 2011, Ms. Paxton saw Claimant for routine psychotherapy (Tr. at 499-500).   Claimant reported that "she has not been doing very well in the past week" (Tr. at 499).   Claimant reported that her sister ran off with a man she met online.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the ALJ's residual functional capacity finding is not supported by substantial evidence (ECF No. 10). Claimant asserts that the testimony of the vocational expert does not provide substantial evidence of jobs that exist in significant numbers in the national economy that Claimant can do, given her age, education, work experience and residual functional capacity. Claimant requests the Court to reverse the decision of the Commissioner or remand this matter for proper vocational evidence to determine whether there is work in significant numbers in the national economy that Claimant can do. The Commissioner asserts that substantial evidence supports the ALJ's determination that Claimant retained the residual functional capacity to perform a wide range of light work including a significant number of unskilled jobs that existed in the national economy (ECF No. 11).

### Residual Functional Capacity supported by substantial evidence

Claimant asserts that the ALJ did not consider the most recent evidence from Claimant's treating physician when he concluded that she had not complained of knee pain since 2009. Additionally, Claimant asserts the ALJ mischaracterized the opinion of the consultative examiner who found that Claimant had considerable crepitus of the knee and limitations of motion (ECF No. 10). Claimant argues that in applying the Medical-Vocational Guidelines, the Fourth Circuit has indicated that the residual functional capacity assessment is "the most important finding." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984). Relying upon *Gordon*, Claimant asserts that if Complainant's RFC had been found by the ALJ to be for only a full range of sedentary exertion, a finding of disabled would have been directed by the Medical-Vocational Guidelines. 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201.09.

The ALJ held that Claimant could perform light work (Tr. at 15, 23).  The ALJ stated that limitations eroded Claimant's exertional work level from light to unskilled light.  Claimant points to language in the Code of Federal Regulations that defines the terms of job exertion classification to assert that because light work is defined as requiring a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  20 C.F.R. § 404.1567(b).  Furthermore, Social Security Ruling 83-10 describes light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted in a particular light job may be very little, a job in this category when it requires a good deal of walking or standing- the primary difference between sedentary and most light jobs.  A job is also in the light work category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls.  The Code of Federal Regulations state that "Relatively few unskilled light jobs are performed in a seated position."  Social Security Ruling 83-10.  The Rule states that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  Sitting may occur intermittently during the remaining time."

Claimant asserts that the ALJ failed to indicate limitations in Claimant's ability to stand and to walk despite finding that Claimant suffered from degenerative joint disease of the left knee with patellofermoral syndrome/tenosysovitis.  Claimant argues that the ALJ's " conclusion that the claimant could perform the standing and walking required to do light work is not supported by [Claimant's] testimony or by the substantial medical evidence of record."

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity.  "RFC represents the most that

an individual can do despite his or her limitations or restrictions." *See* Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996).   Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job.   20 C.F.R. §§ 404.1545(a) and 416.945(a) (2013).   "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." *Id.* "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner.   See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2013).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.   That is, the SSA need not accept only physicians' opinions.   In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The ALJ held that Claimant's degenerative joint disease failed to meet Listing 1.02 Major dysfunction of a joint(s) (Tr. at 14).   The ALJ held that Claimant did not demonstrate characteristics of gross anatomical deformity and chronic joint pain and stiffness with signs of limitations of motion or other abnormal motion of the affected joint(s), and finding on appropriate medically acceptable imaging of joint space narrowing, bone destruction or ankyloses of the affected joint(s) with involvement of one major peripheral weight bearing joint, resulting in inability to ambulate effectively, as defined in 1.00B2b; or involvement of one major

peripheral joint in each upper extremity resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c. (*Id.*)

The ALJ considered the entire record and found that Claimant has the RFC to perform light work except with the following limitations:

> Claimant is able to lift up to twenty pounds occasionally, and lift and carry up to ten pounds frequently in light work as defined by the regulations. She may occasionally climb ramps and stairs, bend, balance, stoop, kneel, crouch and crawl, but may never climb ladders, ropes or scaffolds. She must avoid concentrated exposure to extreme cold, heat, vibration, humidity, wetness and irritants such as fumes, odors, dust, gases, chemicals and poorly ventilated spaces. She must avoid all exposure to hazards such as moving machinery and unsecured heights. Additionally, Claimant is fully capable of learning, remembering and performing simple, routine and repetitive work tasks, involving simple work instructions, which are performed in a low stress work environment, defined as one in which there is no production pace, no strict quota requirements, no strict time standards and no "over-the-shoulder" supervision. She may have occasional contact with supervisors and coworkers, but should have minimal to no contact with the general public (Tr. at 15, 16).

The ALJ considered all of Claimant's symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p (Tr. at 16). The ALJ considered Claimant's symptoms and followed the two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce Claimant's pain or other symptoms. Once an underlying physical or mental impairment(s) that could reasonably be expected to produce Claimant's pain or other symptoms has been shown, the ALJ must evaluate the intensity, persistence and limiting effect of Claimant's symptoms to determine the extent to which they limit Claimant's functioning. Whenever statements about the intensity, persistence or functionally limiting effects of pain or other symptoms are not

substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record.

The ALJ found that Claimant submitted a pain questionnaire and indicated that she suffers from bilateral knee pain, which is continuous in nature. Claimant also submitted adult function reports and indicated she has problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling and climbing stairs. Claimant reported a history of arthritis in her knees and hands. Claimant testified that her left knee hurts when she walks "for a long time" (Tr. at 38). Claimant testified to taking medication for her knee pain. She testified that her doctor gives her cortisone shots in the left knee (Tr. at 38-39). No other testimony pertained to Claimant's knee pain.

The ALJ ruled that the objective evidence did not support the extreme limitations alleged and revealed Claimant is not fully credible (Tr. at 17). Claimant asserts that the ALJ's conclusion that Claimant's subjective testimony on her limitations was not credible "is based on several legal errors and is not supported by substantial evidence" (ECF No. 10). Claimant argues that the ALJ incorrectly assumed that Claimant was required to demonstrate "extreme limitations" to establish that she was disabled. Claimant asserts that if her knee pain precluded her from standing and walking for more than 2 hours in an 8-hour workday, she was entitled to a finding of disabled. Claimant asserts that she did not have to prove she was precluded from all work.

The ALJ noted that Claimant has never sought, nor received, treatment from a specialist regarding her knee (Tr. at 17). The ALJ found that Claimant received treatment that was routine and conservatively in nature, and was prescribed medications that effectively controlled her symptoms. Claimant reported experiencing pain in her left knee in August 2008 at Roane

30

County Healthcare (Tr. at 374).  The Physician's Assistant advised Claimant to wear a knee brace, perform hamstring exercises and take her prescription of Flexeril for muscle spasms (Tr. at 376).  On March 23, 2009, Dr. Christiansen saw Claimant for a follow-up evaluation and reported Claimant's gait and station to be within normal limits (Tr. at 387-388).  Dr. Christiansen found Claimant's bones, joints and muscles to be unremarkable.  Claimant was reported as not being in acute distress.  Claimant's treatment plan involved weight loss.

When Claimant returned to Roane County Family Healthcare for follow-up evaluation of left knee pain, Dr. Christiansen administered steroid injections into Claimant's left knee.  Several medical professionals on different office visits noted Claimant's gait to be normal.  The ALJ found that conservative treatment appeared to effectively control Claimant's symptoms. Claimant's height was 5 ft 4 inches tall and she weighed between 205-225 pounds.  She was counseled numerous times on the importance of weight loss.  In August 2009, Dr. Christiansen reported Claimant to demonstrate left patella crepitus (Tr. at 398).  The same office notes further stated the Claimant had full range of motion and her knee strength was 5/5.

On August 27, 2011, Claimant's treating physician, Dr. Christiansen, completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Physical Impairment form which stated Claimant's onset of impairment began in 2009 (Tr. at 462).  As for the physical limitations, the completed Medical Source Statement reflected that the only physical impairment Dr. Christiansen reported as a contributing factor to determine if Claimant could perform light or sedentary exertional work, was COPD (Tr. at 462-463).  The ALJ gave Dr. Christiansen's opinion no weight, as it was not supported by the medical evidence of record as a whole.

Claimant asserts that the ALJ's decision is not supported by substantial evidence because the ALJ gave Dr. Christiansen's opinion no weight.  Claimant supports this argument by pointing out office visit notes reporting that Claimant complained of her knee aching.  The office visit notes Claimant refers to are dated approximately 2 years following Claimant's last office visit in which she complains of knee pain (Tr. at 10, 314, 487).  During that approximate 2 years lapse between 2009 and 2011, Claimant filed her application for widow's DIB and SSI on September 8, 2010.  Claimant's applications were denied on October 13, 2010, and December 10, 2010.  On January 7, 2011, Claimant filed a written request for a hearing.

Claimant asserts that the ALJ mischaracterized Dr. Wahi's reports and "ignored the characterization of the crepitus in the left knee as 'considerable'" (ECF No. 10).  Dr. Wahi did characterize Claimant as having considerable crepitus in the left knee.  However, Claimant is incorrect in asserting the ALJ ignored Dr. Wahi's finding and opinion contained within his consultative examination (Tr. at 311-314). Dr. Wahi's consultative examination on June 30, 2011, reflected that Claimant's gait was normal (Tr. at 313).  Dr. Wahi reported that Claimant "was able to get on and off the examining table without any difficulty."  Contrary to what Claimant asserts, the ALJ's finding that Claimant has the severe impairment of degenerative joint disease of the left knee does not render his decision inconsistent because he found Claimant did not experience limitation stemming from the knee impairment.  The ALJ held that Claimant did not have an impairment that meets or medically equals the severity of one of the listed impairments (Tr. at 14).  The ALJ discussed Claimant's medical record which indicated Claimant was able to drive, shop, play with her grandchildren, spend time socializing with her sister and her boyfriend, go on a road trip to Kentucky with friends and manage her finances (Tr. at 19).  The ALJ noted that "the therapy progress notes documented the claimant's reports of

daily activities are not limited to the extent one would expect, given complains of disabling symptoms and limitations" (Tr. at 19, 20).

The ALJ gave significant weight to the opinions of State Agency medical experts, Dr. Pascasio and Dr. Lauderman, who agreed that Claimant could stand and/or walk about 6 hours in an 8-hour workday and could do most postural activities occasionally (Tr. at 287-294, 426-434). The ALJ gave these opinions addressing Claimant's ability to work with her knee condition, significant weight because the ALJ found that they were consistent with the medical evidence as a whole (Tr. at 20-21).

The undersigned proposes that the presiding District Judge find that the ALJ properly weighed the medical evidence of record, including the medical opinions. The ALJ found that Claimant effectively controlled her symptoms when she took her medications (Tr.at 18). Although Claimant complains of left knee pain, she was not reported to have an abnormal gait by any of her medical providers. Claimant received intraarticular injections of steroids in her left knee, however, the ALJ pointed out that Claimant treated her knee pain conservatively and never sought treatment from a joint specialist.

**Jobs that Exist in Significant Numbers**

Claimant contends that she is limited to at most a full range of sedentary work. The ALJ held that Claimant could perform work at a light exertional level (Tr. at 15). Claimant asserts that the vocational expert's testimony conflicted with Social Security Ruling 83-12. Vocational expert William Tanzey testified at the administrative hearing in the present matter. He identified three jobs as light, unskilled that Claimant could perform (Tr. at 49). He identified the following positions: laundry worker, domestic cleaner and house sitter (Tr. at 48-49). The ALJ asked Mr. Tanzey if his testimony was consistent with the Dictionary of Occupational Titles to which Mr.

33

Tanzey responded in the affirmative (Tr. at 49).  On cross examination at the administrative hearing, Claimant did not question Mr. Tanzey about any conflicts in the jobs provided and the DOT (Tr. at 46-50).  Claimant proposed a hypothetical with additional physical and mental impairments (Tr. at 50).  The hypothetical included an impairment affecting her ability to perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.*)  Under Claimant's hypothetical, the vocational examiner testified that such an individual would not be able to perform any job.

Claimant argues that Mr. Tanzey incorrectly described the jobs as unskilled, light. Claimant argues that the job of house sitter includes a General Educational Development Reasoning rating 3, which is not consistent with the limitation to simple, routine, repetitive tasks included in an unskilled, light exertional job.  The Claimant also argues that the position of laundry worker is considered semi-skilled, not unskilled.  Claimant asserts that the above two jobs were incorrectly identified by Mr. Tanzey, leaving the identified job of domestic cleaner. Claimant asserts that excluding the two jobs the vocational expert identified because they are not unskilled, light jobs, the remaining position of domestic cleaner must represent a significant number of jobs in the national economy.

The Commissioner asserts that the reasoning levels listed in the DOT reflect the maximum requirements for the jobs listed and not the range of specific requirements an individual must satisfy to perform the job.  *See Lewis v. Commissioner of Social Security*, No. 3:12-cv-01720, 2013 WL 5563764, at *3 (N.D. Oh. Mar. 23, 2012).  The Commissioner asserts that a reasoning level three has been described as requiring the abilities typically possessed by someone who has completed the seventh or eighth grade, and Claimant in the present case completed the eleventh grade (Tr. at 228).  *See Hynes v. Barnhart*, No. 04-cv-490SM, 2005 WL

1458747, at *5 (D. N.H. June 15, 2005).  The Commissioner further asserts that the vocational expert identified the existence of jobs as a domestic cleaner nationally with 300,000 jobs and in the region with 20,000 jobs.  *See* Tr. at 49.

This Court held in *Wood v. Barnhard*, Civil Action No. 2:02-cv-0339 (S.D. W.Va. 2002), that neither the regulations nor the Social Security Rulings require a reduction in residual functional capacity from light to sedentary work because a claimant cannot perform the full range of light work.  In *Wood*, the claimant asserted that substantial evidence did not support the ALJ's finding that he could perform the light jobs identified by the Vocational Expert because the light jobs did not comply with his nonexertional limitation of only being able to stand/walk two hours per day.

SSR 83-12 provides instruction in the instances where a claimant has only exertional limitations and the individual's residual function capacity does not coincide with the definition of any one of the ranges of work described in the regulations.  In that instance, SSR 83-12 indicates that the occupational base is affected and may or may not represent a significant number of jobs in terms of the rules.  SSR 83-12 directs, among other things, that where the extent of erosion of the occupational base is not clear, the ALJ will need to consult a vocational resource.  SSR 83-12, 1983 WL 31253, *2 (1983).

This Court held in *Wood*, "Claimant's inability to perform a full range of light work did not require the ALJ to find him capable of sedentary work."  The fact that Claimant was incapable of performing the full range of standing and walking required for light work and the fact that he suffered other nonexertional limitations, including pain, precluded the ALJ's reliance on the Medical-Vocational Guidelines and required him to rely on a vocational resource.  In fact,

35

the ALJ did just that in calling the vocational expert who identified a significant number of light jobs that Woods could perform despite the limitations related to his ability to stand and walk.

SSR 00-4p does not forbid reliance on a vocational expert's testimony when it conflicts with the DOT, it only requires that the ALJ resolve any conflicts. Policy Interpretations under SSR 00-4p states that "Occupational evidence provided by a VE or VS[3] generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearing level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. Neither the DOT nor the VE or VS evidence automatically 'trumps' when there is a conflict."

The ALJ asked the vocational expert, Mr. Tanzey, at the administrative hearing if a hypothetical individual of Claimant's age, education and work experience performing light work as defined by the regulations could perform jobs in the regional or national economy with limitations including being "fully capable of learning, remembering and performing simple, routine and repetitive work tasks that involve simple work instructions and which are performed in a low stress work environment, which [the ALJ] define[d] as one in which there's no production pace, no strict quota requirements, no strict time standards and no over-the-shoulder supervision" (Tr. at 48). Mr. Tanzey stated that representative examples would include laundry worker, domestic cleaner and house sitter (TR. at 48-49). For clarification, the ALJ asked Mr. Tanzey if all three representative jobs provided were light, unskilled jobs (Tr. at 49). Mr. Tanzey affirmed.

---

[3] Vocational Specialist.

The ALJ directly asked Mr. Tanzey if his testimony was consistent with the Dictionary of Occupational Titles to which Mr. Tanzey affirmed.  If the vocational expert denies any conflicts when asked by the ALJ, the ALJ's duty ends.  *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374-375, 2006 WL 509393, at *4-5 (6th Cir. Mar. 1, 2006).

The testimony provided by Mr. Tanzey did not appear to be in conflict with the DOT.  If a conflict would have been apparent, SSR 00-04p requires that the ALJ just obtain a reasonable explanation.  The ALJ in the present matter inquired if any conflict existed even though none was apparent.  Claimant did not raise the matter of a conflict at the administrative hearing.  Because Claimant did not identify any conflict at the hearing, "she would have to show that the conflict was 'obvious enough that the ALJ should have picked up on [it] without any assistance.'" *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(stating that "SSR 00-4p, 2000 SSR LEXIS 8 requires the ALJ to obtain an explanation only when the conflict between the DOT and the VE's testimony is 'apparent.'") (quoting *Overman v. Astrue*, 546 F.3d 456, 462-463 (7th Cir. 2008).

The United States District Court for the Northern District of West Virginia has recently stated that "Courts have recognized that the DOT's maximum requirements do not necessarily create conflicts and that ALJs are entitled to rely on VE testimony even if the VE's conclusions differ from the DOT."  *Bentley v. Commissioner of Social Security*, No. 1:13-cv-163, 2014 U.S. Dist. LEXIS 30097 (N.D. W.Va. Feb. 11, 2014)(*citing Rutherford v. Barnhart*, 399 F.3d 546, 557 (3d Cir. 2005)(despite "minor inconsistencies," VE testimony can still provide substantial evidence for an ALJ's conclusions).  The DOT's definitions are "simply generic job descriptions that offer 'the approximate maximum requirements for each position, rather than their range.'" *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997)(quoting *Jones v. Chater*, 72 F.3d 81, 82 (8th

Cir. 1995). The DOT itself warns that its descriptions "may not coincide in every respect with the context of jobs as performed in particular establishments or at certain localities." DOT, vol 1, at xiii."[N]ot all the jobs in every category have requirements identical to or as rigorous as those listed in the DOT." *Hall*, 109 F.3d at 1259. Given that the DOT's definitions contain the maximum requirements for each position, *Hall*, 109 F.3d at 1259, Claimant's "reliance on the DOT as a definitive authority on job requirements is misplaced." *Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000) (quoting *Hall*, 109 F.3d at 1259).

In *Bently*, after eliminating the jobs Claimant couldn't perform from the jobs identified by the vocational expert, the Court found that two jobs remained that were significant in number. The Court found that the vocational expert's testimony was "well reasoned and based on a hypothetical question that included all of Claimant's limitations." As such, Magistrate Judge Kaull proposed the District Court find that substantial evidence supported the ALJ's determination, based on the testimony of the vocational expert, that there are a significant number of jobs in the national economy that Claimant could perform.

In the present case, the Court has reviewed the jobs identified by the vocational expert in the Dictionary of Occupational Titles and notes that of the three jobs identified, only the job of domestic cleaner meets strict adherence to the General Educational Development Reasoning rating of R2 and Specific Vocational Preparation rating of 2 incorporated in an unskilled, light job. Although the undersigned is not persuaded by Claimant's argument that the jobs of laundry worker and house sitter should not have been identified as responses by Mr. Tanzey, even giving Claimant's argument the benefit of the doubt, the remaining job of domestic cleaner, represents a

significant number of jobs in the national and regional economy.[4]   Claimant requests a remand for the Commissioner to decide this very issue, however, the ALJ has already ruled on the matter and the Commissioner affirmed by adopting the ALJ's decision as the final decision (Tr. at 1). The ALJ held that the three representative jobs provided by the vocational expert existed in significant number nationally and regionally.   Claimant's argument that the job of domestic cleaner would need to be addressed on remand to determine if it exists in significant numbers nationally and regionally would mean that the ALJ's decision holding the three jobs identified at the hearing only accumulatively satisfy the representative occupation requirement.   There is no evidence on the record to support such a contention.

The ALJ's decision stated "Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" (Tr. at 23).  The ALJ relied on the testimony of Mr. Tanzey.  Mr. Tanzey was asked what jobs an individual such as Claimant could perform with the limitations Claimant experiences.   Mr. Tanzey replied that the hypothetical individual would be able to perform the requirements of representative occupations such as a laundry worker, domestic cleaner and house sitter.

Accordingly, the Court proposes that the presiding District Judge find that substantial evidence supports the ALJ's decision that Claimant could perform unskilled, light work. Substantial evidence supports the weight given the medical opinions as well as non-medical opinions on the record.  The ALJ provided an adequate explanation in his decision for the weight given to the opinions on the record and that his findings are in keeping with the applicable

---

[4] At the administrative hearing, Mr. Tanzey testified that 300,000 domestic cleaner jobs were identified nationally, while 20,000 domestic cleaner jobs were identified regionally (Tr. at 49).  Mr. Tanzey defined region in this case to include West Virginia, Ohio and Kentucky (Tr. at 47).

regulation. 20 C.F.R. § 404.1527(d)(2)(2013) (The opinions of medical sources should be weighed using the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization and (6) various other factors.).

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge DENY the Plaintiff's Motion for Judgment on the Pleadings, GRANT Defendant's Brief in Support of Defendant's Decision, AFFIRM the final decision of the Commissioner and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable John T. Copenhaver, Jr. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to counsel of record.

Entered:  August 18, 2014

Dwane L. Tinsley
United States Magistrate Judge